NICHOLAS A. TRUTANICH
United States Attorney
District of Nevada
Nevada Bar #13644
REBECCA CLINTON
Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
rebecca.clinton@usdoj.gov
PATRICK MOTT
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
Patrick.mott@usdoj.gov

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| UNITED STATES OF AMERICA, | Case No. 2:19-mj-557-CWH |
|---|---|
| Plaintiff, | CRIMINAL COMPLAINT |
| v. | **COUNT I** |
| NADIR MIR, | Health Care Fraud, in violation of 18 U.S.C. § 1347 |
| Defendant. | |

BEFORE the United States Magistrate Judge, Las Vegas, Nevada, the undersigned Complainant, being first duly sworn, deposes and states:

## AFFIDAVIT

I, ERIN M. BRANTLEY, being duly sworn, state as follows:

### I. Background of Affiant

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed for three years. My current responsibilities include the investigation of white collar crime, including mail fraud, wire fraud, health care fraud, and money laundering.

1

2. As an FBI Special Agent I have participated in numerous health care fraud investigations. As a result of my training and experience, I am familiar with the applicable laws and regulations governing the Medicare health insurance program, and with various types of schemes to defraud the Medicare program.

3. This affidavit is submitted in support of a criminal complaint alleging that NADIR MIR has violated Title 18, United States Code, Section 1347. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging NADIR MIR with health care fraud, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, bank records, documents submitted to the Medicare program, and interviews with witnesses.

5. As described in more detail below, there is probable cause to believe that MIR has knowingly and willfully defrauded the Medicare program by misrepresenting the ownership and control of Hope Home Health, LLC, and then causing to be submitted claims for reimbursement of home health services allegedly provided to Medicare beneficiaries, which claims would not have been paid had Medicare been aware of MIR's misrepresentations as to the ownership and control of Hope Home Health, LLC, and fraudulently obtained money from the Medicare program.

## II. Facts Supporting Probable Cause

### Overview of the Investigation

6. Since no later than 2015, Altamash Mir, the brother of NADIR MIR, has been paying NADIR MIR and other individuals to act as paper owners of home health agencies located in Illinois, Indiana, and Nevada that Altamash Mir covertly owns and controls, including Atlas Home Health Services, Hope Home Health, LLC, Midwest Pearl Home Healthcare Inc., United Medical Care, Inc., and State Home Health Agency Ltd. (the "Subject Agencies"). Since August 2015, NADIR MIR has acted on behalf of Altamash Mir as a paper owner of Hope Home Health, LLC ("Hope"), a home health agency located in Las Vegas, Nevada. In that capacity, NADIR MIR has concealed Altamash Mir's ownership and control of Hope by affirmatively misrepresenting to Medicare that Hope is still owned and controlled by its prior owner, Individual A.

7. According to records maintained by Nevada Secretary of State, Hope is actively registered as a limited liability company in Nevada and NADIR MIR is identified as the company's "manager" and sole officer.

8. The home health agencies that Altamash Mir covertly owns and operates, including Hope, outsource all "back office" functions, including the submission of claims to Medicare, to Altamash Mir's consulting company, Home Health Care Consulting. The home health agencies make regular payments by check to Home Health Care Consulting USA Inc., a North Carolina corporation owned by Altamash Mir. The employees of Home Health Care Consulting who cause the electronic submission of claims to Medicare on behalf of the agencies that pay Home Health Care Consulting work out of an office in Pakistan.

9. In addition to controlling electronic claims submission and other "back office" functions handled by Home Health Care Consulting, Altamash Mir controls the bank accounts

of the Subject Agencies either indirectly, by directing the paper owners of the agencies to execute financial transactions on his behalf, or directly, by causing the stamping the signatures of the authorized signers on the Subject Agencies' bank accounts on checks. All of the Subject Agencies, including Hope, make payments to shell companies owned and controlled by Altamash Mir, including Palmetto GBA, LLC ("Palmetto-NY"), a company incorporated by Mir in New York that shares the same name as a South Carolina corporation ("Palmetto-SC") that holds the contract for processing Medicare claims in several states in the Midwest region, including Illinois. Altamash Mir is the sole signatory on the bank accounts for Palmetto-NY. Altamash Mir uses the Medicare funds paid from the Subject Agencies to Palmetto-NY to cover personal expenses and make payments to Home Health Care Consulting or other home health agencies controlled by Altamash Mir.

10. By falsely representing to Medicare that Individual A, rather than Altamash Mir, owns and controls Hope, and then causing Hope to submit claims to Medicare for home health services, NADIR MIR, along with others, executed a scheme to defraud Medicare. By then distributing the proceeds of the fraud to Palmetto-NY and other entities owned by Altamash Mir by check, NADIR MIR further concealed and disguised the nature, the location, the source, the ownership, or the control of the proceeds of the health care fraud.

11. On January 18, 2019, Muhammad Ateeq, an employee of Home Health Care Consulting, was arrested in the Northern District of Illinois on health care fraud charges stemming from his use of false names to purchase several Illinois home health agencies and then cause the submission of over $16 million in false claims to Medicare for home health services

that were never rendered.1  The false claims submitted on behalf of the agencies acquired by Ateeq were submitted from the office of Home Health Care Consulting in Pakistan.

### Background

12.  The United States Department of Health and Human Services ("HHS") is an agency of the United States government. HHS's activities, operations, programs, and obligations are funded with federal monies. These programs include the Health Insurance for the Aged and Disabled Program, commonly known as Medicare. The Medicare program is a federal health care program providing benefits to persons who are age 65 or older, or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency under HHS. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

13.  Medicare is a health care benefit program, as defined by Title 18, United States Code, Section 24(b) and a Federal health care program as defined by Title 42, United States Code, Section 1320a-7b(f).

14.  Enrolled providers for medical services to Medicare recipients are eligible for reimbursement for covered medical services. By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies and procedures governing reimbursement, and to keep and allow access to records and information as required by Medicare. In order to receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors.

---

1 *See United States v. Muhammad Ateeq*, No. 19-cr-52 (N.D. Ill.).

15. Health care providers are provided with online access to Medicare manuals and bulletins describing proper billing procedures and billing rules and regulations. Providers are required to maintain patient records to verify that the services provided match the services described on the claim form.

16. Upon certification, the medical provider, whether a clinic or an individual, is assigned a provider identification number for billing purposes (referred to as an NPI). When the medical provider rendered a service, the provider submits a claim for reimbursement to the Medicare contractor that includes the NPI assigned to that medical provider.

17. Medicare Part A helps pay for medically necessary home health and hospital care. Medicare authorizes payment for home health care only if the care was actually provided and was medically necessary, that is, the services were required because of disease, disability, infirmity, or impairment. Medicare will not pay for services and treatment that were not actually provided or for which the patient did not meet the criteria necessary to justify the claimed service or treatment.

18. In order to submit claims to Medicare, home health agencies are required to submit a CMS Form 855A provider enrollment application in which the agencies are required to identify individuals or entities who are owners, managing employees, directors or officers of the agencies. Home health agencies are required to update the CMS Form 855A upon the occurrence of various events, including changes to their ownership structure or management.

19. In order to receive payment from Medicare through direct deposit to a provider's bank account, rather than by paper check, a provider must submit a CMS Form 588 Electronic Funds Transfer Authorization Agreement ("EFT Agreement"). The EFT Agreement must specify the financial institution and account into which Medicare reimbursements are to be

deposited and must be signed by an individual who is designated as either an "authorized official" or "delegated official" on the CMS Form 855A provider enrollment application.

20. Based on my training and experience, Medicare will not pay for claims submitted by a provider if Medicare knows that the provider has intentionally provided false information about its ownership or management on provider enrollment applications or other forms submitted to Medicare, including EFT agreements.

21. Home health agencies generally bill Medicare for services they provide in 60 day increments. This is known as an "episode of care."

### Home Health Care Consulting

22. According to North Carolina Secretary of State records, Home Health Care Consulting USA, Inc. ("HHCC-USA") is a corporation that was formed in North Carolina on or about October 4, 2013. As of July 30, 2019, North Carolina Secretary of State records showed that the sole officer of HHCC-USA is Tasneem Jamal, Altamash Mir's mother, and that the registered office for HHCC-USA is 383 S. Swing Road, Greensboro, North Carolina.

23. When interviewed by agents on or about October 31, 2018, Altamash Mir reported that he is the owner of HHCC-USA and that HHCC-USA performs medical billing, quality assurance consulting, medical coding, medical chart reviews, assistance with medical audits, and reviews of clinical medical records on behalf of client home health agencies.

24. According to PNC bank records, Altamash Mir and Tasneem Jamal are the two authorized signatories on the bank accounts of HHCC-USA. PNC bank records show that HHCC-USA received checks from each of the Subject Agencies, including Hope, on a regular basis.

25. Agents have confirmed through interviews that checks made out to HHCC-USA from at least two of the Subject Agencies, United Medical Care, Inc. ("United"), and State Home

7

Health Agency Ltd. ("State"), are stamped with the signatures of the authorized signers on the bank accounts without the authorization of the purported signers. Specifically, Employee J.N., the authorized signer on the account for United Medical Care, Inc., reported to agents that s/he stopped working for United Medical Care and any other agencies associated with Altamash Mir in or about October 2018. Bank records show that checks from United Medical Care to HHCC-USA and the majority of all other United Medical Care checks continued to bear the stamped signature of Employee J.N. after that time. Additionally, Individual F, a relative of Altamash Mir, informed agents on or about July 26, 2019 that, at Altamash Mir's instruction, s/he has been stamping the signature of the authorized signer for State on State's checks, without the consent of the authorized signer, since at least January 2019.

26.     From January 2016 through March 2018, Hope made over 50 payments to HHCC-USA for a total of over $125,000. As discussed further below, since 2018, each of the Subject Agencies, including Hope has also made payments to Palmetto-NY, a shell company exclusively controlled by Altamash Mir.

### Acquisition of Hope Home Health LLC

27.     According to provider enrollment applications maintained by Medicare, Hope Home Health, LLC is a home health agency located in Las Vegas, Nevada that has been owned by Individual A and Individual D since January 24, 2005. Individual A signed provider enrollment applications affirming the ownership of the company and identifying himself/herself as Hope's president and authorized official on March 14, 2005, April 10, 2012, and August 9, 2012.

28.     According to a stock purchase agreement provided to agents by Individual A, on or about May 12, 2015, Hope was purchased from Individual A and Individual D by a holding company called Hope Home Health Services, Inc. for a total of $300,000.

29. Agents interviewed Individual A and Individual D on or about July 1, 2019. Individual A reported that s/he sold Hope to a group of three Pakistani individuals that included Altamash Mir, Individual B, and Individual E, each of whom Individual A was able to identify by name based on their driver's license photographs. Individual A further reported that after the sale was completed, the new owners of Hope designated NADIR MIR as the day-to-day manager of the company. Individual A and Individual D, who continued working at Hope for approximately one year after the sale, understood that the new owners of Hope had outsourced back office functions including billing and quality assurance to individuals living in the Chicago area.

30. Individual A reported that after the sale of Hope, s/he transferred control of Hope's bank account at Wells Fargo to NADIR MIR and Individual B. Bank records provided by Wells Fargo show that on August 20, 2015, NADIR MIR and Individual B signed signature cards for Hope bank accounts indicating that each was an "owner with control of the entity." NADIR MIR and Individual B were the only authorized signers on the accounts. According to the Wells Fargo "Business Account Application" accompanying the signature cards, the cards were signed at the "Charleston Mohawk" Wells Fargo location. The Wells Fargo website indicates that the "Charleston Mohawk" branch is located at 5410 W. Charleston Blvd., Las Vegas, Nevada. Wells Fargo records for Hope's accounts reflect numerous deposits at branches in and around Las Vegas and numerous withdrawals from ATMs located in and around Las Vegas.

31. Individual A informed agents that after the sale, NADIR MIR and Altamash Mir told Individual A that they would submit a provider enrollment application to Medicare disclosing the new owners and managers of Hope. According to records maintained by Medicare, no updated provider enrollment forms were ever submitted to document the change

1  in ownership and control of Hope. Individual A reported that s/he has not had any contact with any of the buyers of Hope since approximately 2017.

32. Since the sale of Hope by Individual A, Hope has been located at 1401 S. Arville St., Suite G, Las Vegas, Nevada.

### False Statements to Medicare Regarding Ownership of Hope

33. According to documents received from a Medicare contractor who services Medicare providers in Nevada ("Medicare Contractor"), the Medicare Contractor received an application from Hope Home Health, LLC, on or about August 7, 2017. The application sought to change Hope Home Health's electronic funds transfer enrollment with Medicare. The application listed the National Provider Number for Hope Home Health as 1790824316. The application identified US Bank account XXXXXX4979. The application identified NADIR MIR as the "Contact Person," described him as the "Manager Operations," and listed 702-XXX-4673 as his telephone number and "nadirjmir@gmail.com" as his email address. The application includes a signature that purports to be that of Individual A, whom the application identifies as the Administrator of Hope Home Health, and is dated August 1, 2017.

34. According to documents received from the Medicare Contractor, on or about August 15, 2017, the Medicare Contractor sent an email to "nadirjmir@gmail" and "hopehomehealth@gmail.com" in which the Medicare Contractor wrote: "Nadir or Remedios, Please contact Medicare Provider Enrollment at 765-XXX-0234 in regards to your submitted EFT form to US Bank."

35. Employee A, an employee of Hope who regularly communicated with NADIR MIR in person at Hope and over the phone, confirmed to agents that NADIR MIR uses the email

address "nadirjmir@gmail.com."[2] Specifically, Employee A reported that as recently as January 2019, NADIR MIR responded by text message to an email that Employee A had sent to "nadirjmir@gmail.com." Additionally, Employee A reported that a second employee, Employee B, requested office supplies from NADIR MIR by sending emails to "nadirjmir@gmail.com."

36. According to documents received from the Medicare Contractor, on or about August 15, 2017, an employee of the Medicare Contractor received a telephone call from "Nadir," who stated that Individual A signed and authorized the change to Hope Home Health's electronic funds transfer enrollment with Medicare.

37. According to Individual A, s/he did not sign the August 2017 application. Specifically, Individual A was shown the August 1, 2017 electronic funds transfer application, and confirmed that the signature purporting to be that Individual A was not Individual A's signature.

38. According to documents received from the Medicare Contractor, the Medicare Contractor received an application from Hope Home Health, LLC, on or about September 25, 2017. The application sought to change Hope Home Health's electronic funds transfer enrollment with Medicare for a second time. The application listed the National Provider Number for Hope Home Health as 1790824316. The application identified Bank of America account XXXXXXXX1722. The application identified NADIR MIR as the "Contact Person," described him as the "Manager Operations," and listed 702-XXX-4673 as his telephone number and "nadirjmir@gmail.com" as his email address. The application includes a signature that

---

[2] Employee A informed agents that s/he was in a romantic relationship with NADIR MIR that ended no later than January 2019, when NADIR MIR stopped responding to communications from Hope employees.

purports to be that of Individual A, whom the application identifies as the Administrator of Hope Home Health, and is dated September 20, 2017.

39. According to documents received from the Medicare Contractor, on or about September 27, 2017, an employee of the Medicare Contractor sent an email acknowledging receipt of the EFT agreement to "nadirjmir@gmail.com."

40. According to documents received from the Medicare Contractor, an employee of the Medicare Contractor discussed the September 2017 application with a person purporting to be Individual A on or about October 2, 2017, and that person verified the change to Hope Home Health's electronic funds transfer enrollment with Medicare.

41. According to Individual A, s/he did not sign the September 2017 application and did not speak with the Medicare contractor concerning the application. As with the August 1, 2017 application, when Individual A reviewed the September 20, 2017 application, Individual A confirmed that the signature purporting to be that Individual A was not Individual A's signature.

42. According to documents received from the Medicare Contractor, the Medicare Contractor received an application from Hope Home Health, LLC, on or about May 17, 2019. The application sought to change Hope Home Health's electronic funds transfer enrollment with Medicare for a third time. The application listed the National Provider Number for Hope Home Health as 1790824316. The application identified JP Morgan Chase account XXXXXX8070. The application identified NADIR J MIR as the "Contact Person," described him as the "Manager Operations," and listed 702-XXX-4673 as his telephone number and "hopehha01@gmail.com" as his email address. The application includes a signature that purports to be that of Individual A, whom the application identifies as the Administrator of Hope Home Health, and is dated May 13, 2019.

43. According to documents received from the Medicare Contractor, on or about June 18, 2019, an employee of the Medicare contractor attempted to contact Individual A and was told that s/he is "no longer with the company" and that "Nadir is in Chicago." On or about June 19, 2019, an employee of the Medicare contractor received a telephone call from "Nadir," who used 708-XXX-8030, during which the individual self-identified as Nadir "adamantly" stated that Individual A was the owner of Hope Home Health and that Individual A signed and authorized the change to Hope Home Health's electronic funds transfer enrollment with Medicare.

44. According to Individual A, s/he did not sign the May 2019 application. As with the August 1, 2017 and September 20, 2017 applications, when Individual A reviewed the May 13, 2019 application, Individual A confirmed that the signature purporting to be that Individual A was not Individual A's signature.

**Submission of Claims to Medicare Following False Statements Regarding Ownership of Hope and Distribution of Proceeds to Entities Controlled by Altamash Mir**

45. Medicare claims data indicates that, from the submission of the August 1, 2017 EFT Agreement falsely identifying Individual A as Hope's authorized person through the present, Hope has submitted claims to Medicare that have resulted in approximately $3.8 million in payments to Hope.

46. According to Medicare claims data, on or about May 25, 2018, Hope submitted a claim for a 60-day episode of care purportedly provided to Beneficiary B.D. that began on August 18, 2017 and ended on October 16, 2017, resulting in $6,198.53 in payment to Hope. At the time the claim was submitted, as a result of NADIR MIR's false statements, Medicare's records

showed that Individual A, rather than Altamash Mir, Indivdiual B, or Individual E, was the owner of Hope.

47. Based on my training and experience, the ownership and control of a home health company is material to Medicare's determination whether to pay claims. Stated another way, based on my training and experience, Medicare would not have made payment on any claims submitted by Hope had Medicare known that NADIR MIR was concealing the true ownership and control of the company. Also based on my training and experience, one incentive for Altamash Mir to conceal his control of the Subject Companies, including Hope, was to avoid raising suspicions with Medicare as to the common ownership and control of so many home health companies by a single individual.

**Distribution of Proceeds of Fraud to Entities Controlled by Altamash Mir**

48. Since the submission of the August 1, 2017 EFT Agreement falsely identifying Individual A as Hope's authorized person, Hope has issued at least three checks bearing the signature of NADIR MIR to Palmetto-NY for a total of over $13,000. As stated above, Altamash Mir exerts exclusive control of Palmetto-NY and uses funds distributed to Palmetto-NY for his personal use and to fund other entities under his control.

**NADIR MIR's Absence from Hope's Office Following Altamash Mir's Departure from the United States**

49. As noted above, on or about January 18, 2019, agents arrested Muhammad Ateeq, an HHCC employee who had been operating several home health agencies in the Chicago area using multiple false names. According to a law enforcement database, two days later, on January 20, 2019, Altamash Mir boarded a flight to Pakistan that he had reserved earlier that same day. According to Employee A and the other employees of Hope interviewed by agents, NADIR MIR

abruptly stopped coming to Hope's office and responding to Hope employees' phone calls in approximately mid-January 2019. Bank records, however, indicate that checks to Hope employees continued to bear the signature of NADIR MIR.

50. On or about July 1, 2019, law enforcement officers interviewed NADIR MIR in Las Vegas, Nevada. During that interview, NADIR MIR told law enforcement officers that Attorney A represented MIR and the interview terminated.

51. On or about July 26, 2019, law enforcement officers interviewed Individual F. Separately, on July 26, 2019, law enforcement officers interviewed Individual G, the spouse of Individual F, both of whom are relatives of NADIR MIR. During the interview, Individual F told law enforcement officers that s/he had a stamp that s/he used at the direction of Altamash Mir to sign the name of a prior owner of one of the Subject Agencies. During the interview, Individual F instructed Individual G to provide law enforcement officers with the signature stamp.

52. On or about July 28, 2019, at approximately 6:03 p.m., a law enforcement database reported that Individual H, the uncle of NADIR MIR and Altamash Mir, purchased a same day ticket to Istanbul, Turkey scheduled to depart from Chicago, Illinois, at 9:40 p.m. According to Individual F, Individual H helped manage Hope and one other agency located in Las Vegas, Nevada for Altamash Mir.

53. On or about July 29, 2019, at approximately 4:12 p.m. Central Standard Time, a law enforcement database reported that NADIR MIR purchased a round-trip ticket to Kuala Lampur, Malaysia on July 29, 2019, scheduled to depart on July 30, 2019, from Los Angeles, California, at 1:25 a.m.

//

### III. Conclusion

54. Based on the above information, I respectfully submit that there is probable cause to believe that beginning no later than August 2017 and continuing through at least January 2019, NADIR MIR knowingly and willfully participated in a scheme to defraud health care benefit programs, including Medicare, and to obtain, by means of false and fraudulent representations, money under the control of those programs in connection with the delivery of or payment for health care services, and in execution of the scheme, on May 25, 2018, did knowingly cause to be submitted a false claim, specifically, a claim that certain home health services were provided to Beneficiary B.D. from August 18, 2017 through October 16, 2017, when defendant knew that he had concealed the true ownership and control of Hope through his intentional misrepresentations, in violation of Title 18, United States Code, Section 1347.

/s/
_____
ERIN M. BRANTLEY
Special Agent, Federal Bureau of Investigation

This Complaint was subscribed, sworn, and attested
to me telephonically pursuant to
Federal Rule of Criminal Procedure 4.1(b)(2)(A) on this
30th day of July, 2019 at 11 : 44 p.m./a.m.

_____
HONORABLE
United States Magistrate Judge

C.W. HOFFMAN, JR.
U.S. MAGISTRATE JUDGE